## SUN OIL CO. *v.* WORTMAN ET AL.

No. 87–352.   Argued March 22, 1988—Decided June 15, 1988

SCALIA, J., delivered the opinion of the Court, in Part I of which all participating Members joined, in Part II of which REHNQUIST, C. J., and WHITE, STEVENS, and O'CONNOR, JJ., joined, and in Part III of which BRENNAN, WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. BRENNAN, J., filed an opinion concurring in part and concurring in the judgment, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 734. O'CONNOR, J., filed an opinion concurring in part and dissenting in part, in which REHNQUIST, C. J., joined, *post*, p. 743. KENNEDY, J., took no part in the consideration or decision of the case.

*Gerald Sawatzky* argued the cause for petitioner. With him on the briefs were *Jim H. Goering, Timothy B. Mustaine,* and *Edwyn R. Sherwood.*

*Gordon Penny* argued the cause for respondents. With him on the briefs were *W. Luke Chapin* and *Stephen Jones.**

JUSTICE SCALIA delivered the opinion of the Court.

Petitioner Sun Oil Company seeks reversal of a decision of the Supreme Court of Kansas that it is liable for interest on certain previously suspended gas royalties. *Wortman* v. *Sun Oil Co.*, 241 Kan. 226, 755 P. 2d 488 (1987) *(Wortman III)*. The Kansas Supreme Court rejected petitioner's contentions that (1) the Full Faith and Credit Clause of the Constitution, Art. IV, § 1, and the Due Process Clause of the Fourteenth Amendment prohibited application of Kansas' statute of limitations so as to allow to proceed in Kansas courts a suit barred by the statute of limitations of the State whose substantive law governs the claim, and (2) those same Clauses of the Constitution mandated interpretations of other States' substantive laws concerning interest that were different from those arrived at by the Kansas courts. We granted certiorari. 484 U. S. 912 (1987).

## I

In the 1960's and 1970's, petitioner, a Delaware corporation with its principal place of business in Texas, extracted gas from properties that it leased from respondents. The leases provided that respondents would receive a royalty, usually one-eighth of the proceeds, from the sale of gas. Petitioner sold the gas in interstate commerce at prices that had to be approved by the Federal Power Commission (FPC). The FPC permitted petitioner on several occasions to collect proposed increased prices from customers pending final approval, but required petitioner to refund with interest any amount so collected that was not ultimately approved. Specifically, petitioner had on file with the FPC an under-

---

*Charles Alan Wright* and *Brent M. Rosenthal* filed a brief for Wiley Goad as *amicus curiae* urging affirmance.

taking to comply with regulations, now codified at 18 CFR § 154.102 (1987), requiring petitioner to refund any ultimately unapproved increase plus interest at certain specified rates. § 154.102(c). Petitioner made no royalty payments to respondents on the increased amounts collected until the FPC approved the increases. The respondents' royalty shares of these increases have been called "suspended royalty payments" in this litigation.

In July 1976, petitioner paid respondents $1,167,000 in suspended royalty payments after the FPC approved increases that had been collected from July 1974 through April 1976. These payments covered 670 properties, 43.7% of which were located in Texas, 24% in Oklahoma, and 22.8% in Louisiana. In April 1978, petitioner paid respondents $2,676,000 in suspended royalty payments after the FPC approved increases that had been collected from December 1976 through April 1978. These payments covered 690 properties, 40.3% located in Texas, 31.6% in Oklahoma, and 23.6% in Louisiana.

In August 1979, respondents Richard Wortman and Hazel Moore filed a class action in a Kansas trial court on behalf of all landowners to whom petitioner had made or should have made suspended royalty payments, seeking interest on those payments for the period that the payments were held and used by petitioner. The trial court ruled that Kansas law governed all claims for interest, even claims relating to leases in another State and brought by residents of that State. The court further ruled that under Kansas law petitioner was liable for prejudgment interest at the rates petitioner had agreed to pay with respect to customer refunds under the FPC regulations. These rates were 7% per annum prior to October 10, 1974; 9% from then until September 30, 1979; and thereafter the average prime rate compounded quarterly. The trial court relied on Shutts v. Phillips Petroleum Co., 222 Kan. 527, 567 P. 2d 1292 (1977) (Shutts I), cert. denied, 434 U. S. 1068 (1978). That case, which also involved suspended royalty payments, had held that Kansas law gov-

erned the claims of residents of other States concerning properties in those States, and that under Kansas law (1) the royalty owners were entitled to interest on suspended royalty payments because the royalty payments became owing under the royalty contract at the moment the gas company's customers paid the increases and (2) the interest rate to be used was that set forth in the FPC regulations because the gas company's corporate undertaking with the FPC constituted an agreement to pay that rate. See 222 Kan., at 562–565, 567 P. 2d, at 1317–1319.

The principles of *Shutts I* were reaffirmed in *Shutts* v. *Phillips Petroleum Co.*, 235 Kan. 195, 679 P. 2d 1159 (1984) *(Shutts II)*, a factually similar case involving suspended royalty payments different from those in *Shutts I*. The original decision of the trial court in this case was then affirmed on the strength of *Shutts II* in *Wortman* v. *Sun Oil Co.*, 236 Kan. 266, 690 P. 2d 385 (1984) *(Wortman I)*. The losing gas companies in both cases petitioned this Court for certiorari.

We reversed that part of *Shutts II* which held that Kansas could apply its substantive law to claims by residents of other States concerning properties located in those States, and remanded that case to the Kansas Supreme Court for application of the governing law of the other States to those claims. *Phillips Petroleum Co.* v. *Shutts*, 472 U. S. 797, 816–823 (1985) *(Shutts III)*. We also vacated the decision in *Wortman I* and remanded it for reconsideration in light of our decision in *Shutts III*. *Sun Oil Co.* v. *Wortman*, 474 U. S. 806 (1985) *(Wortman II)*.

On the remand in this case, the trial court held that under the law of the other States that had been held by *Shutts III* to govern the vast majority of claims, petitioner was liable for interest at the rate specified in the FPC regulations. The trial court further held that nothing in *Shutts III* precluded the application of Kansas' 5-year statute of limitations to these claims, and that therefore claims for interest on the suspended royalty payments made in July 1976 were timely.

The Kansas Supreme Court agreed with the first of these holdings in *Shutts* v. *Phillips Petroleum Co.*, 240 Kan. 764, 732 P. 2d 1286 (1987) *(Shutts IV)*, cert. pending, No. 87–348. The decision that the other States' pertinent substantive legal rules were consistent with those of Kansas was reaffirmed in *Wortman III*, the decision we now review. *Wortman III* also held that this Court's decision in *Shutts III* applied only to substantive law, and not to procedural matters such as the appropriate statute of limitations.

## II

This Court has long and repeatedly held that the Constitution does not bar application of the forum State's statute of limitations to claims that in their substance are and must be governed by the law of a different State. See, *e. g.*, *Wells* v. *Simonds Abrasive Co.*, 345 U. S. 514, 516–518 (1953); *Townsend* v. *Jemison*, 9 How. 407, 413–420 (1850); *McElmoyle* v. *Cohen*, 13 Pet. 312, 327–328 (1839). We granted certiorari to reexamine this issue. We conclude that our prior holdings are sound.

## A

The Full Faith and Credit Clause provides:

> "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."

The Full Faith and Credit Clause does not compel "a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate." *Pacific Employers Ins. Co.* v. *Industrial Accident Comm'n*, 306 U. S. 493, 501 (1939). Since the procedural rules of its courts are surely matters on which a State is competent to legislate, it follows that a State may apply its own procedural rules to actions litigated in its courts. The issue here, then, can be characterized as whether a statute of

limitations may be considered as a procedural matter for purposes of the Full Faith and Credit Clause.

Petitioner initially argues that *McElmoyle* v. *Cohen, supra,* was wrongly decided when handed down. The holding of *McElmoyle,* that a statute of limitations may be treated as procedural and thus may be governed by forum law even when the substance of the claim must be governed by another State's law, rested on two premises, one express and one implicit. The express premise was that this reflected the rule in international law at the time the Constitution was adopted. This is indisputably correct, see *Le Roy* v. *Crowninshield,* 15 F. Cas. 362, 365, 371 (No. 8,269) (Mass. 1820) (Story, J.) (collecting authorities), and is not challenged by petitioner. The implicit premise, which petitioner does challenge, was that this rule from international law could properly have been applied in the interstate context consistently with the Full Faith and Credit Clause.

The first sentence of the Full Faith and Credit Clause was not much discussed at either the Constitutional Convention or the state ratifying conventions. However, the most pertinent comment at the Constitutional Convention, made by James Wilson of Pennsylvania, displays an expectation that would be interpreted against the background of principles developed in international conflicts law. See 2 M. Farrand, The Records of the Federal Convention of 1787, p. 488 (rev. ed. 1966). Moreover, this expectation was practically inevitable, since there was no other developed body of conflicts law to which courts in our new Union could turn for guidance.[1]

---

[1] JUSTICE BRENNAN's concurrence, *post,* at 740, misunderstands the famous statement from *Milwaukee County* v. *M. E. White Co.,* 296 U. S. 268, 276–277 (1935), that "[t]he very purpose of the full faith and credit clause was to alter the status of the several states as independent foreign sovereignties." This statement is true, as the context of the statement in *Milwaukee County* makes clear, not because the Clause itself radically changed the principles of conflicts law but because it made conflicts principles enforceable as a matter of constitutional command rather than leaving enforcement to the vagaries of the forum's view of comity. See *Estin* v.

The reported state cases in the decades immediately following ratification of the Constitution show that courts looked without hesitation to international law for guidance in resolving the issue underlying this case: which State's law governs the statute of limitations. The state of international law on that subject being as we have described, these early decisions uniformly concluded that the forum's statute of limitations governed even when it was longer than the limitations period of the State whose substantive law governed the merits of the claim. See *Nash* v. *Tupper*, 1 Cai. 402, 412–413 (N. Y. 1803) (citing unreported 1795 New York case,

---

*Estin*, 334 U. S. 541, 546 (1948) (the Full Faith and Credit Clause "substituted a command for the earlier principles of comity and *thus* basically altered the status of the States as independent sovereigns") (emphasis added).

The concurrence's assertion, *post*, at 740–741, n. 3, that *Milwaukee County* did not rely upon international conflicts law is entirely beside the point. It is not our point that the content of the Full Faith and Credit Clause is governed by international conflicts law, but only (in order to meet petitioner's contention that *McElmoyle* was wrong when decided) that its original content was properly derived from that source. The conflicts law embodied in the Full Faith and Credit Clause allows room for common-law development, just as did the international conflicts law that it originally embodied. But the concurrence points to no such common-law development. The rule applied in *McElmoyle* continues to be the rule applied by most of the States. Nor, contrary to what the concurrence says, *post*, at 740–741, n. 3, did *Milwaukee County* strike down a practice that was in accord with then-accepted conflicts principles. Although the Restatement of Conflicts of Laws § 443 (1934) had taken the position that a judgment for taxes was not enforceable in another State, our opinion noted that "[t]he precise question now presented appears to have been decided in only a single case, *New York* v. *Coe Manufacturing Co.*, 112 N. J. L. 536, 172 Atl. 198 [(1934)]," which held, as did this Court, that such a judgment was enforceable. 296 U. S., at 278–279. The opinion took some pains, moreover, to distinguish the traditional conflicts rules that one State need not entertain an action for taxes based on another State's statute, *id.*, at 274–277; see also *id.*, at 279, and that generally one State need not enforce a judgment from another State for a penalty, see *id.*, at 279–280. Cf. Restatement of Conflicts of Laws § 443, Comment *d* (1948 Supp.) (money judgments based on tax claims are enforceable "since such claims are not deemed penalties").

*Page* v. *Cable,* holding the same); *Pearsall* v. *Dwight,* 2 Mass. 84, 89–90 (1806); *Ruggles* v. *Keeler,* 3 Johns. 263, 267–268 (N. Y. 1808) (Kent, C. J.); *Graves* v. *Graves's Executor,* 5 Ky. 207, 208–209 (1810). By 1820, the use of the forum statute of limitations in the interstate context was acknowledged to be "well settled." *Medbury* v. *Hopkins,* 3 Conn. 472, 473 (1820); accord, *Le Roy* v. *Crowninshield, supra,* at 371 ("settled"); cf. *McCluny* v. *Silliman,* 3 Pet. 270, 276–277 (1830) ("well settled"); *Hawkins* v. *Barney's Lessee,* 5 Pet. 457, 466 (1831) ("not to be questioned"). Obviously, judges writing in the era when the Constitution was framed and ratified thought the use of the forum statute of limitations to be proper in the interstate context. Their implicit understanding that the Full Faith and Credit Clause did not preclude reliance on the international law rule carries great weight.

Moreover, this view of statutes of limitations as procedural for purposes of choice of law followed quite logically from the manner in which they were treated for domestic-law purposes. At the time the Constitution was adopted the rule was already well established that suit would lie upon a promise to repay a debt barred by the statute of limitations — on the theory, as expressed by many courts, that the debt constitutes consideration for the promise, since the bar of the statute does not extinguish the underlying right but merely causes the remedy to be withheld. See *Little* v. *Blunt,* 26 Mass. 488, 492 (1830) ("[T]he debt remained, the remedy was gone"); see also *Wetzell* v. *Bussard,* 11 Wheat. 309, 311 (1826). This is the same theory, of course, underlying the conflicts rule: the right subsists, and the forum may choose to allow its courts to provide a remedy, even though the jurisdiction where the right arose would not. See *Graves* v. *Graves's Executor, supra,* at 208–209 ("The statute of limitations . . . does not destroy the right but withholds the remedy. It would seem to follow, therefore, that the *lex fori,*

and not the *lex loci* was to prevail with respect to the time when the action should be commenced").

The historical record shows conclusively, we think, that the society which adopted the Constitution did not regard statutes of limitations as substantive provisions, akin to the rules governing the validity and effect of contracts, but rather as procedural restrictions fashioned by each jurisdiction for its own courts. As Chancellor Kent explained in his landmark work, 2 J. Kent, Commentaries on American Law 462–463 (2d ed. 1832): "The period sufficient to constitute a bar to the litigation of sta[l]e demands, is a question of municipal policy and regulation, and one which belongs to the discretion of every government, consulting its own interest and convenience."

Unable to sustain the contention that under the original understanding of the Full Faith and Credit Clause statutes of limitations would have been considered substantive, petitioner argues that we should apply the modern understanding that they are so. It is now agreed, petitioner argues, that the primary function of a statute of limitations is to balance the competing substantive values of repose and vindication of the underlying right; and we should apply that understanding here, as we have applied it in the area of choice of law for purposes of federal diversity jurisdiction, where we have held that statutes of limitations are substantive, see *Guaranty Trust Co.* v. *York*, 326 U. S. 99 (1945).

To address the last point first: *Guaranty Trust* itself rejects the notion that there is an equivalence between what is substantive under the *Erie* doctrine and what is substantive for purposes of conflict of laws. 326 U. S., at 108. Except at the extremes, the terms "substance" and "procedure" precisely describe very little except a dichotomy, and what they mean in a particular context is largely determined by the purposes for which the dichotomy is drawn. In the context of our *Erie* jurisprudence, see *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), that purpose is to establish (within the limits

of applicable federal law, including the prescribed Rules of Federal Procedure) substantial uniformity of predictable outcome between cases tried in a federal court and cases tried in the courts of the State in which the federal court sits. See *Guaranty Trust, supra,* at 109; *Hanna* v. *Plumer,* 380 U. S. 460, 467, 471–474 (1965). The purpose of the substance-procedure dichotomy in the context of the Full Faith and Credit Clause, by contrast, is not to establish uniformity but to delimit spheres of state legislative competence. How different the two purposes (and hence the appropriate meanings) are is suggested by this: It is never the case under *Erie* that either federal *or* state law—if the two differ—can properly be applied to a particular issue, cf. *Erie, supra,* at 72–73; but since the legislative jurisdictions of the States overlap, it is frequently the case under the Full Faith and Credit Clause that a court can lawfully apply either the law of one State or the contrary law of another, see *Shutts III,* 472 U. S., at 823 ("[I]n many situations a state court may be free to apply one of several choices of law"). Today, for example, we do not hold that Kansas must apply its own statute of limitations to a claim governed in its substance by another State's law, but only that it may.

But to address petitioner's broader point of which the *Erie* argument is only a part—that we should update our notion of what is sufficiently "substantive" to require full faith and credit: We cannot imagine what would be the basis for such an updating. As we have just observed, the words "substantive" and "procedural" themselves (besides not appearing in the Full Faith and Credit Clause) do not have a precise content, even (indeed especially) as their usage has evolved. And if one consults the purpose of their usage in the full-faith-and-credit context, that purpose is quite simply to give both the forum State and other interested States the legislative jurisdiction to which they are entitled. If we abandon the currently applied, traditional notions of such entitlement we would embark upon the enterprise of constitutionalizing

choice-of-law rules, with no compass to guide us beyond our own perceptions of what seems desirable.[2]   There is no more reason to consider recharacterizing statutes of limitation as substantive under the Full Faith and Credit Clause than there is to consider recharacterizing a host of other matters generally treated as procedural under conflicts law, and hence generally regarded as within the forum State's legislative jurisdiction.   See, *e. g.*, Restatement (Second) of Conflict of Laws § 131 (remedies available), § 133 (placement of burden of proof), § 134 (burden of production), § 135 (sufficiency of the evidence), § 139 (privileges) (1971).

In sum, long established and still subsisting choice-of-law practices that come to be thought, by modern scholars, un-

---

[2] Contrary to JUSTICE BRENNAN's concurrence, *post*, at 739–742, there is nothing unusual about our approach.   This Court has regularly relied on traditional and subsisting practice in determining the constitutionally permissible authority of courts.   See, *e. g.*, *Young* v. *United States ex rel. Vuitton et Fils, S. A.*, 481 U. S. 787, 795, and n. 7 (1987) (Article III); *Tull* v. *United States*, 481 U. S. 412, 417–421 (1987) (Seventh Amendment); *Aetna Life Ins. Co.* v. *Lavoie*, 475 U. S. 813, 820–821 (1986) (disqualification of judges); *Press-Enterprise Co.* v. *Superior Court of California, Riverside County*, 464 U. S. 501, 505–508 (1984) (openness of jury selection process); *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 57–60, and nn. 10–11, 64–76, and nn. 15, 25, 86–87, n. 39 (1982) (plurality opinion of BRENNAN, J., joined by MARSHALL, BLACKMUN, and STEVENS, JJ.) (Article III); *id.*, at 90–91 (REHNQUIST, J., joined by O'CONNOR, J., concurring in judgment); *United States* v. *Nixon*, 418 U. S. 683, 696 (1974) ("In the constitutional sense, controversy . . . means the kind of controversy courts traditionally resolve").   The concurrence's citation, *post*, at 740, of the criticism by the plurality opinion in *Allstate Ins. Co.* v. *Hague*, 449 U. S. 302 (1981), of *Hartford Accident & Indemnity Co.* v. *Delta & Pine Land Co.*, 292 U. S. 143 (1934), is not to the contrary. That criticism merely rejected the view that the Constitution enshrines the rule that the law of the place of contracting governs validity of all provisions of the contract.   By the time of *Allstate*, of course, such a rule could not have been characterized as a subsisting tradition, if it ever could have been, in light of escape devices such as the doctrine of public policy, characterization of an issue as procedural, and the rule that the law of the place of performance governs matters of performance.

wise, do not thereby become unconstitutional. If current conditions render it desirable that forum States no longer treat a particular issue as procedural for conflict of laws purposes, those States can themselves adopt a rule to that effect, *e. g., Heavner* v. *Uniroyal, Inc.*, 63 N. J. 130, 135–141, 305 A. 2d 412, 415–418 (1973) (statute of limitations), or it can be proposed that Congress legislate to that effect under the second sentence of the Full Faith and Credit Clause, cf. *Mills* v. *Duryee*, 7 Cranch 481, 485 (1813); *Pacific Employers Ins. Co.* v. *Industrial Accident Comm'n*, 306 U. S., at 502. It is not the function of this Court, however, to make departures from established choice-of-law precedent and practice constitutionally mandatory. We hold, therefore, that Kansas did not violate the Full Faith and Credit Clause when it applied its own statute of limitations.

## B

Petitioner also makes a due process attack upon the Kansas court's application of its own statute of limitations.[3]

---

[3] Although petitioner takes up this issue after discussion of the full-faith-and-credit claim, and devotes much less argument to it, we may note that, logically, the full-faith-and-credit claim is entirely dependent upon it. It cannot possibly be a violation of the Full Faith and Credit Clause for a State to decline to apply another State's law in a case where that other State *itself* does not consider it applicable. Although in certain circumstances standard conflicts law considers a statute of limitations to bar the right and not just the remedy, see Restatement (Second) of Conflict of Laws § 143 (1971), petitioner concedes, see Tr. of Oral Arg. 4–5, that (apart from the fact that Kansas does not so regard the out-of-state statutes of limitations at issue here) Texas, Oklahoma, and Louisiana view their own statutes as procedural for choice-of-law purposes, see, *e. g., Los Angeles Airways, Inc.* v. *Lummis*, 603 S. W. 2d 246, 248 (Tex. Civ. App. 1980), cert. denied, 455 U. S. 988 (1982); *Western Natural Gas Co.* v. *Cities Service Gas Co.*, 507 P. 2d 1236, 1242 (Okla.), cert. denied, 409 U. S. 1052 (1972); *Kirby Lumber Co.* v. *Hicks Co.*, 144 La. 473, 475, 80 So. 663 (1919). A full-faith-and-credit problem can therefore arise only if that disposition by those other States is invalid—that is, if they, as well as Kansas, are compelled to consider their statutes of limitations substantive. The nub of the present controversy, in other words, is the scope of constitution-

Here again neither the tradition in place when the constitutional provision was adopted nor subsequent practice supports the contention. At the time the Fourteenth Amendment was adopted, this Court had not only explicitly approved (under the Full Faith and Credit Clause) forum-state application of its own statute of limitations, but the practice had gone essentially unchallenged. And it has gone essentially unchallenged since. "If a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it." *Jackman* v. *Rosenbaum Co.*, 260 U. S. 22, 31 (1922).

A State's interest in regulating the workload of its courts and determining when a claim is too stale to be adjudicated certainly suffices to give it legislative jurisdiction to control the remedies available in its courts by imposing statutes of limitations. Moreover, petitioner could in no way have been unfairly surprised by the application to it of a rule that is as old as the Republic. There is, in short, nothing in Kansas' action here that is "arbitrary or unfair," *Shutts III*, 472 U. S., at 821–822, and the due process challenge is entirely without substance.

## III

In *Shutts III*, we held that Kansas could not apply its own law to claims for interest by nonresidents concerning royalties from property located in other States. The Kansas Supreme Court has complied with that ruling, but petitioner claims that it has unconstitutionally distorted Texas, Oklahoma, and Louisiana law in its determination of that law made in *Shutts IV* and applied to this case in *Wortman III*.

To constitute a violation of the Full Faith and Credit Clause or the Due Process Clause, it is not enough that a

---

ally permissible legislative jurisdiction, and it matters little whether that is discussed in the context of the Full Faith and Credit Clause, as the litigants have principally done, or in the context of the Due Process Clause. Since we are largely traversing ground already covered, our discussion of the due process claim can be brief.

state court misconstrue the law of another State. Rather, our cases make plain that the misconstruction must contradict law of the other State that is clearly established and that has been brought to the court's attention. See, *e. g., Pennsylvania Fire Ins. Co.* v. *Gold Issue Mining & Milling Co.*, 243 U. S. 93, 96 (1917); *Western Life Indemnity Co.* v. *Rupp*, 235 U. S. 261, 275 (1914); *Louisville & Nashville R. Co.* v. *Melton*, 218 U. S. 36, 51–52 (1910); *Banholzer* v. *New York Life Ins. Co.*, 178 U. S. 402, 408 (1900); see also *Shutts III*, *supra*, at 834–842 (STEVENS, J., concurring in part and dissenting in part). We cannot conclude that any of the interpretations at issue here runs afoul of this standard.

1. *Texas:* Petitioner contests the Kansas Supreme Court's interpretation of Texas law on the interest rate. Texas' statutory rate of 6% does not apply when a "specified rate of interest is agreed upon by the parties." Tex. Rev. Civ. Stat. Ann., Art. 5069–1.03 (Vernon 1987). Such an agreement need not be express, but can be inferred from conduct. See *Preston Farm & Ranch Supply, Inc.* v. *Bio-Zyme Enterprises*, 625 S. W. 2d 295, 298, 300 (Tex. 1981). The Kansas court held an agreement to pay interest at a higher rate was implied by petitioner's undertaking with the FPC to comply with federal regulations setting forth the applicable rates of interest for refundable moneys held in suspense. See *Shutts IV*, 240 Kan., at 777, 783–784, 790–791, 732 P. 2d, at 1298, 1302, 1306; see also *Shutts I*, 222 Kan., at 562–565, 567 P. 2d, at 1317–1319.

Petitioner brought to the Kansas court's attention no Texas decision clearly indicating that an agreement to pay interest at a specified rate would not be implied in these circumstances.[4] Petitioner's reliance on *Phillips Petroleum*

---

[4] The partial dissent's dissatisfaction with our decision to let stand Kansas' interpretation of Texas law, as well as Oklahoma and Louisiana law, see *infra*, at 733–734, appears to rest on two premises: (1) That respondents have some threshold burden of supporting Kansas' interpretation of what the other States' laws would likely be, *post*, at 743–744, 745–746, 746–747, 748,

Co. v. *Stahl Petroleum Co.*, 569 S. W. 2d 480 (Tex. 1978), is misplaced. Although that case was similar to the present one on its facts, the point at issue here was neither raised nor decided. In *Stahl*, the intermediate Texas court had ordered interest paid at the statutory 6% rate. There is noth-

---

and (2) that respondents have not met that burden because Kansas' view of contract law is a manifest departure from normal and proper principles of contract law. *Post*, at 746, 748–749. We think neither premise is correct.

First, placing the initial burden on respondents to support the Kansas court's interpretations is flatly inconsistent with the precedent of this Court. Relief cannot be granted in this Court unless decisions plainly contradicting the Kansas court's interpretations were brought to the Kansas court's attention. See, *e. g., Western Life Indemnity Co.* v. *Rupp*, 235 U. S. 261, 275 (1914) ("If such decision existed, it was incumbent upon defendant to prove it as matter of fact"); *Texas & N. O. R. Co.* v. *Miller*, 221 U. S. 408, 416 (1911) ("There was neither allegation nor proof that the court of last resort in Louisiana had considered the question or made any ruling upon it, and so it became the duty of the Texas courts . . . to decide the question according to their independent judgment"); *Louisville & Nashville R. Co.* v. *Melton*, 218 U. S. 36, 52 (1910) ("[S]uch settled construction must be pleaded and proved").

Second, the partial dissent appears to assume that contract law requires a promisor to make a conscious assumption of an obligation in order to be bound. It is standard contract law, however, that a party may be bound by a custom or usage even though he is unaware of it, and indeed even if he positively intended the contrary. See U. C. C. §§ 1–201(3), 1–205(3), and Comment 4, 1 U. L. A. 44, 84, 85 (1976); Restatement (Second) of Contracts § 221, and Comment *a* (1981). The Kansas Supreme Court considered petitioner's undertaking with the FPC (as well as the reference to a similar undertaking in an indemnity agreement proposed by another oil company to its lessors) to be evidence of an industry usage (or "common understanding," U. C. C. § 1–205, Comment 4, 1 U. L. A. 86) that in a case such as the present one interest would be paid at the FPC-prescribed rates. See *Shutts IV*, 240 Kan., at 784, 732 P. 2d, at 1302 (describing undertaking with FPC as showing "industry practice"). Especially since the existence and scope of a particular usage is usually a question of fact, see U. C. C. § 1–205(2), 1 U. L. A. 84; Restatement (Second) of Contracts § 219, Comment *a*; § 222(2), it seems particularly inappropriate to suggest that the Kansas court, without having been referred to any decisions on the subject from the other States, should have known that its decision was contrary to the *law* of those other States.

ing to indicate, however, that the royalty owner had requested anything else, and only the lessee and not the royalty owner appealed. *Id.*, at 481. Thus, the Texas Supreme Court's holding that 6% interest was payable is in no way a holding that more than 6% was not. It is far from unconstitutional for the Kansas Supreme Court to anticipate that the Texas Supreme Court would distinguish the case on the eminently reasonable ground that no rate of interest based on an implied agreement was at issue.

2. *Oklahoma:* Petitioner contests the Kansas Supreme Court's interpretations of Oklahoma law as to both liability for interest and the rate to be paid. Concerning liability, petitioner relies on a statute providing that "[a]ccepting payment of the whole principal, as such, waives all claim to interest." Okla. Stat., Tit. 23, § 8 (1981). But the Oklahoma Supreme Court has held that this statute does not bar a claim for interest based on an implied agreement to pay interest, since in that event the interest becomes, for purposes of the statute, part of the "principal" owed. See *Webster Drilling Co.* v. *Sterling Oil of Oklahoma, Inc.*, 376 P. 2d 236, 238 (1962). Regarding the rate of interest, Oklahoma law provides for 6% only "in the absence of any contract as to the rate of interest, and by contract the parties may agree to any rate as may be authorized by law." Okla. Stat., Tit. 15, § 266 (1981). Thus, for Oklahoma as for Texas, petitioner's contention founders on the fact that it pointed to no decision indicating that an agreement to pay more than 6% interest would not be implied in circumstances such as those of the present case.

3. *Louisiana:* Finally, petitioner contests the Kansas Supreme Court's interpretation of Louisiana law both as to liability for interest and the rate to be paid. Concerning liability, petitioner relies on *Whitehall Oil Co.* v. *Boagni*, 217 So. 2d 707 (La. App. 1968), aff'd on other issues, 255 La. 67, 229 So. 2d 702 (1969). That case involved a situation opposite from that involved here: the gas companies had *paid* the

royalties on increased prices before FPC approval, and were seeking interest on those payments when the approval *did not* ensue. It thus involved a claim for unjust enrichment, see 217 So. 2d, at 709, and does not stand for the proposition that no interest is recoverable on a contractual debt—which would arguably (if not inevitably) have been governed by the Louisiana statute mandating interest on "[a]ll debts . . . from the time they become due." La. Civ. Code Ann., Art. 1938 (West 1977); see also *Wurzlow* v. *Placid Oil Co.*, 279 So. 2d 749, 772–774 (La. App.) (applying Art. 1938 to oil and gas royalties), cert. denied, 282 So. 2d 140 (La. 1973).

As to petitioner's claim that if interest was payable Louisiana's 7% rate clearly applied: The 7% rate specified in the above-quoted statute applied "unless otherwise stipulated." Art. 1938. Petitioner brought to the Kansas court's attention no Louisiana decision indicating that an implied agreement could not constitute such a stipulation, or that an implied agreement would not be found in the circumstances of this case. Cf. *Boutte* v. *Chevron Oil Co.*, 316 F. Supp. 524, 531 (ED La. 1970) (dictum) (gas company will owe royalty owner interest at FPC rates on suspended royalty payments once FPC approves increases), aff'd, 442 F. 2d 1337 (CA5 1971).

\* \* \*

For the reasons stated, the judgment of the Kansas Supreme Court is

*Affirmed.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, concurring in part and concurring in the judgment.

I join Parts I and III of the Court's opinion. Although I also agree with the result the Court reaches in Part II, I

reach that result through a somewhat different path of analysis.

For 150 years, this Court has consistently held that a forum State may apply its own statute of limitations period to out-of-state claims even though it is longer or shorter than the limitations period that would be applied by the State out of which the claim arose. See *Wells* v. *Simonds Abrasive Co.*, 345 U. S. 514 (1953) (shorter); *Townsend* v. *Jemison*, 9 How. 407 (1850) (longer); *McElmoyle* v. *Cohen*, 13 Pet. 312 (1839) (shorter). The main question presented in this case is whether this line of authority has been undermined by more recent case law concerning the constitutionality of state choice-of-law rules.[1] See *Phillips Petroleum Co.* v. *Shutts*, 472 U. S. 797 (1985); *Allstate Ins. Co.* v. *Hague*, 449 U. S. 302 (1981). I conclude that it has not.

I start, as did the Court in *Wells*, by emphasizing that "[t]he Full Faith and Credit Clause does not compel a state to adopt any particular set of rules of conflict of laws; it merely sets certain minimum requirements which each state must observe when asked to apply the law of a sister state." 345 U. S., at 516. The minimum requirements imposed by the Full Faith and Credit Clause[2] are that a forum State should not apply its law unless it has "'a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.'" *Phillips Petroleum, supra,* at 818, quot-

---

[1] I agree with the Court's rejection of petitioner's additional argument that the constitutionality of applying the forum State's limitations period should be judged under the "outcome-determinative" test of *Guaranty Trust Co.* v. *York*, 326 U. S. 99 (1945). See *ante,* at 726–727.

[2] The minimum requirements imposed by the Due Process Clause are, in this context, the same as those imposed by the Full Faith and Credit Clause. See *Phillips Petroleum Co.* v. *Shutts*, 472 U. S. 797, 818–819 (1985); *Allstate Ins. Co.* v. *Hague*, 449 U. S. 302, 308, and n. 10 (1981) (plurality opinion of BRENNAN, J., joined by WHITE, MARSHALL, and BLACKMUN, JJ.); *id.,* at 332 (Powell, J., joined by Burger, C. J., and REHNQUIST, J., dissenting).

ing *Allstate, supra,* at 312–313 (plurality opinion of BREN-NAN, J., joined by WHITE, MARSHALL, and BLACKMUN, JJ.). The constitutional issue in this case is somewhat more complicated than usual because the question is not the typical one of whether a State can constitutionally apply its substantive law where both it and another State have certain contacts with the litigants and the facts underlying the dispute. Rather the question here is whether a forum State can constitutionally apply its limitations period, which has mixed substantive and procedural aspects, where its contacts with the dispute stem only from its status as the forum.

Were statutes of limitations purely substantive, the issue would be an easy one, for where, as here, a forum State has no contacts with the underlying dispute, it has no substantive interests and cannot apply its own law on a purely substantive matter. Nor would the issue be difficult if statutes of limitations were purely procedural, for the contacts a State has with a dispute by virtue of being the forum always create state procedural interests that make application of the forum's law on purely procedural questions "neither arbitrary nor fundamentally unfair." *Phillips Petroleum, supra,* at 818. Statutes of limitations, however, defy characterization as either purely procedural or purely substantive. The statute of limitations a State enacts represents a balance between, on the one hand, its substantive interest in vindicating substantive claims and, on the other hand, a combination of its procedural interest in freeing its courts from adjudicating stale claims and its substantive interest in giving individuals repose from ancient breaches of law. A State that has enacted a particular limitations period has simply determined that after that period the interest in vindicating claims becomes outweighed by the combination of the interests in repose and avoiding stale claims. One cannot neatly categorize this complicated temporal balance as either procedural or substantive.

Given the complex of interests underlying statutes of limitations, I conclude that the contact a State has with a claim simply by virtue of being the forum creates a sufficient procedural interest to make the application of its limitations period to wholly out-of-state claims consistent with the Full Faith and Credit Clause. This is clearest when the forum State's limitations period is shorter than that of the claim State. A forum State's procedural interest in avoiding the adjudication of stale claims is equally applicable to in-state and out-of-state claims. That the State out of which the claim arose may have concluded that at that shorter period its substantive interests outweigh its procedural interest in avoiding stale claims would not make any difference; it would be "'neither arbitrary nor fundamentally unfair,'" *Phillips Petroleum, supra,* at 818, for the forum State to conclude that *its* procedural interest is more weighty than that of the claim State and requires an earlier time bar, as long as the time bar applied in a nondiscriminatory manner to in-state and out-of-state claims alike.

The constitutional question is somewhat less clear where, as here, the forum State's limitations period is longer than that of the claim State. In this situation, the claim State's statute of limitations reflects its policy judgment that at the time the suit was filed the combination of the claim State's procedural interest in avoiding stale claims and its substantive interest in repose outweighs its substantive interest in vindicating the plaintiff's substantive rights. Assuming, for the moment, that each State has an equal substantive interest in the repose of defendants, then a forum State that has concluded that its procedural interest is less weighty than that of the claim State does not act unfairly or arbitrarily in applying its longer limitations period. The claim State does not, after all, have any substantive interest in *not* vindicating rights it has created. Nor will it do to argue that the forum State has no interest in vindicating the substantive rights of nonresidents: the forum State cannot discriminate against

nonresidents, and if it has concluded that the substantive rights of its citizens outweigh its procedural interests at that period then it cannot be faulted for applying that determination evenhandedly.

If the different limitations periods also reflect differing assessments of the substantive interests in the repose of defendants, however, the issue is more complicated. It is, to begin with, not entirely clear whether the interest in the repose of defendants is an interest the State has as a forum or wholly as the creator of the claim at issue. Even if one assumes the latter, determining whether application of the forum State's longer limitations period would thwart the claim State's substantive interest in repose requires a complex assessment of the relative weights of both States' procedural and substantive interests. For example, a claim State may have a substantive interest in vindicating claims that, at a particular period, outweighs its substantive interest in repose standing alone but not the combination of its interests in repose and avoiding the adjudication of stale claims. Such a State would not have its substantive interest in repose thwarted by the claim's adjudication in a State that professed no procedural interest in avoiding stale claims, even if the forum State had less substantive interest in repose than the claim State, because the forum State would be according the claim State's substantive interests all the weight the claim State gives them. Such efforts to break down and weigh the procedural and substantive components and interests served by the various States' limitations periods would, however, involve a difficult, unwieldy and somewhat artificial inquiry that itself implicates the strong procedural interest any forum State has in having administrable choice-of-law rules.

In light of the forum State's procedural interests and the inherent ambiguity of any more refined inquiry in this context, there is some force to the conclusion that the forum State's contacts give it sufficient procedural interests to make it " 'neither arbitrary nor fundamentally unfair,' " *Phillips Pe-*

*troleum*, 472 U. S., at 818, for the State to have a *per se* rule of applying its own limitations period to out-of-state claims — particularly where, as here, the States out of which the claims arise view their statutes of limitations as procedural. See *ante*, at 729–730, n. 3. The issue, after all, is not whether the decision to apply forum limitations law is wise as a matter of choice-of-law doctrine but whether the decision is within the range of constitutionally permissible choices, *Wells*, 345 U. S., at 516, and we have already held that distinctions similar to those offered above "are too unsubstantial to form the basis for constitutional distinctions," *id.*, at 517–518 (holding that it is constitutionally irrelevant whether the foreign limitations period is built into the statutory provision creating the out-of-state cause of action at issue). This conclusion may not be compelled, but the arguments to the contrary are at best arguable, and any merely arguable inconsistency with our current full-faith-and-credit jurisprudence surely does not merit deviating from 150 years of precedent holding that choosing the forum State's limitations period over that of the claim State is constitutionally permissible.

The Court's technique of avoiding close examination of the relevant interests by wrapping itself in the mantle of tradition is as troublesome as it is conclusory. It leads the Court to assert broadly (albeit in dicta) that States do not violate the Full Faith and Credit Clause by adjudicating out-of-state claims under the forum's own law on, *inter alia*, remedies, burdens of proof, and burdens of production. *Ante*, at 728. The constitutionality of refusing to apply the law of the claim State on such issues was not briefed or argued before this Court, and whether, as the Court asserts without support, there are insufficient reasons for "recharacterizing" these issues (at least in part) as substantive is a question that itself presents multiple issues of enormous difficulty and importance which deserve more than the offhand treatment the Court gives them.

Even more troublesome is the Court's sweeping dictum that *any* choice-of-law practice that is "long established and still subsisting" is constitutional. *Ibid.* This statement on its face seems to encompass choice-of-law doctrines on purely substantive issues, and the blind reliance on tradition confuses and conflicts with the full-faith-and-credit test we articulated just three years ago in *Phillips Petroleum, supra,* at 818. See also *Allstate,* 449 U. S., at 308–309, n. 11 (plurality opinion of BRENNAN, J., joined by WHITE, MARSHALL, and BLACKMUN, JJ.) (stating that a 1934 case giving "controlling constitutional significance" to a traditional choice-of-law test "has scant relevance for today"). That certain choice-of-law practices have so far avoided constitutional scrutiny by this Court is in any event a poor reason for concluding their constitutional validity. Nor is it persuasive that the practice reflected the rule applied by States or in international law around the time of the adoption of the Constitution, see *ante,* at 723–726, since "[t]he very purpose of the full faith and credit clause was to alter the status of the several states as independent foreign sovereignties," *Milwaukee County* v. *M. E. White Co.,* 296 U. S. 268, 276–277 (1935), not to leave matters unchanged.[3] The Court never offers a satisfactory

---

[3] The Court miscites *Milwaukee County* and *Estin* v. *Estin,* 334 U. S. 541 (1948), for the proposition that the Full Faith and Credit Clause merely made traditional principles of conflicts law enforceable as a matter of constitutional command. See *ante,* at 723–724, n. 1. Although the Court correctly notes that *Estin* states that the Full Faith and Credit Clause "substituted a command for the earlier principles of comity," *Estin, supra,* at 546, nowhere does *Estin* state that the content of that substituted command is determined by reference to principles of traditional conflicts law. To the contrary, *Estin* never refers to traditional conflicts law but rather decides the full-faith-and-credit issue by carefully examining the interests of the various States in having their law applied. 334 U. S., at 546–549. Similarly, *Milwaukee County* does not rely on traditional conflicts law but on the conclusion that the interests behind the local policy were "too trivial to merit serious consideration when weighed against the policy of the constitutional provision and the interest of the [foreign] state whose judgment is challenged." *Milwaukee County* v. *M. E. White Co.,* 296

explanation as to why tradition should enable States to engage in practices that, under our current test, are "arbitrary" or "fundamentally unfair." The broad range of choice-of-law practices that may, in one jurisdiction or another, be traditional are not before this Court and have not been surveyed by it, and we can only guess what practices today's opinion

U. S., at 277. Indeed, *Milwaukee County* expressly noted that its holding that a forum State was constitutionally obligated to enforce a foreign judgment for taxes conflicted with the traditional (and then-subsisting) conflicts of law rule that such foreign judgments were unenforceable. *Id.*, at 279, n. 4 (citing and declining to follow § 443 of the 1934 Restatement of Conflict of Laws). See also Restatement of Conflict of Laws § 443, p. 159 (Supp. 1948) (explaining that this traditional conflicts rule had to be modified because it had been invalidated in *Milwaukee County*). Although *Milwaukee County* also stated that only a single case had decided the question whether a State's tax judgment was entitled to full faith and credit in another State, *Milwaukee County*, *supra*, at 278, the Court did not question the fact that the rule against enforcing foreign tax judgments accorded with then-accepted common-law conflicts doctrine. See also E. Scoles & P. Hay, Conflict of Laws §§ 24.19, 24.23 (1982). In fact, this traditional conflicts rule continues to subsist in the international context where the Full Faith and Credit Clause does not apply. See, *e. g.*, *Her Majesty, Queen in Right of Province of British Columbia* v. *Gilbertson*, 597 F. 2d 1161, 1163–1166, and n. 8 (CA9 1979); *Commissioner of Taxes, Federation of Rhodesia* v. *McFarland*, [1965(1)] S. A. 470, 472 (South Africa Sup. Ct. 1964); *United States* v. *Harden*, [1963] S. C. R. 366 (Canada Sup. Ct.); Uniform Foreign Money-Judgments Recognition Act § 1(2), 13 U. L. A. 263 (1986) (excluding foreign tax judgments from the judgments enforceable under the Act) (adopted in 16 States); Foreign Judgments (Reciprocal Enforcement) Act, 1933, 23 & 24 Geo. 5, ch. 13, pt. I, § 1(2)(b) (same). That *Milwaukee County* did not also invalidate the traditional rules barring adjudication of a foreign tax suit or enforcement of a foreign penalty judgment, see *ante*, at 723–724, n. 1, is irrelevant—*Milwaukee County* reasoned that the constitutional validity of those conflicts rules was not presented, not that their traditional status rendered them sacrosanct. The simple fact remains that the question the Court addressed in *Milwaukee County*, like the question we should address in this case, was not one of conflicts law but of whether as a constitutional matter the forum State had interests justifying application of its own law. "Of that question this Court is the final arbiter," *Milwaukee County*, *supra*, at 274, not tradition or existing practice.

approves sight unseen. Nor am I much comforted by the fact that the Court opines on the constitutionality of traditional choice-of-law practices only to the extent they are "still subsisting," for few cases involve challenges to practices that no longer subsist. One wonders as well how future courts will determine which practices are traditional enough (or subsist strongly enough) to be constitutional, and about the utility of requiring courts to focus on such an uncertain and formalistic inquiry rather than on the fairness and arbitrariness of the choice-of-law rule at issue. Indeed, the disarray of the Court's test is amply demonstrated by the fact that two of the Justices necessary to form the Court leave open the issue of whether a forum State could constitutionally refuse to apply a shorter limitations period regarded as substantive by the foreign State, see *post,* at 743 (O'CONNOR, J., joined by REHNQUIST, C. J., concurring in part and dissenting in part), even though in many States the subsisting tradition of applying the forum's limitations period recognizes no exception for limitations periods considered substantive by the foreign State. See generally Restatement (Second) of Conflict of Laws § 143 and Reporter's Note (1971) (collecting cases).[4]

---

[4] The Court misses the point by stating that relying on tradition is not "unusual." *Ante,* at 728, n. 2. That we have in other contexts examined tradition to determine the constitutionally permissible authority of courts is no explanation for abandoning the "interest-contacts" test we have long applied to determine the constitutionally permissible authority of States under the Full Faith and Credit Clause. Nor does it explain why we should adopt a constitutional test that, in the context of conflicts of laws, is confused and purposeless. The Court only heaps more confusion on its "traditional and subsisting practice" test by asserting that by the time of *Allstate Ins. Co.* v. *Hague,* 449 U. S. 302 (1981), the rule that the law of the place of contracting applies "could not have been characterized as a subsisting tradition, if it ever could have been." *Ante,* at 728, n. 2. The doubt expressed about whether this rule was ever a subsisting tradition is remarkable given that it was once *the* dominant rule for determining what law applied in contract cases. See, *e. g.,* Restatement of Conflict of Laws § 332 (1934). True, by the time of *Allstate* the rule no longer commanded a consensus, but the rule still "subsisted" in a majority of States. Scoles &

In short, I fear the Court's rationale will cause considerable mischief with no corresponding benefit. This mischief is all the more unfortunate because it appears to stem from the misperception that this case cannot be resolved without conclusively labeling statutes of limitations as either "procedural" or "substantive." Having asked the wrong question (and an unanswerable one), it is no wonder the Court resorts to tradition rather than analysis to answer it. Because I believe a careful examination of the *Phillips Petroleum* test and the governmental interests created by the relevant contacts provides narrower and sounder grounds for affirming, I concur in the judgment.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE joins, concurring in part and dissenting in part.

The Court properly concludes that Kansas did not violate the Full Faith and Credit Clause or the Due Process Clause when it chose to apply its own statute of limitations in this case. Different issues might have arisen if Texas, Oklahoma, or Louisiana regarded its own shorter statute of limitations as substantive. Such issues, however, are not presented in this case, and they are appropriately left unresolved. Accordingly, I join Parts I and II of the Court's opinion.

In my view, however, the Supreme Court of Kansas violated the Full Faith and Credit Clause when it concluded that the three States in question would apply the interest rates

---

Hay, Conflict of Laws § 18.21, at 666–667. It is difficult to see why this lack of uniformity or the existence of "escape devices" should render this traditional rule any less of a "subsisting tradition" than the rule that the limitations period of the forum governs, which does not apply in many States and which is subject to "escape devices" allowing application of the foreign limitations period when it is "built into" the statute creating the right, when it has attributes the forum State would regard as substantive, when it is considered substantive by the foreign State, and when the forum State has a borrowing statute. See generally Restatement (Second) of Conflict of Laws § 143 and Reporter's Note (1971) (collecting cases).

set forth in the regulations of the Federal Power Commission (FPC). The Court correctly states that misconstruing those States' laws would not by itself have violated the Constitution, for the Full Faith and Credit Clause only required the Kansas court to adhere to law that was clearly established in those States and that had been brought to the Kansas court's attention. See *ante,* at 730–731. Under the standard the Court articulates, however, the Clause was violated. Each of the three States has a statute setting an interest rate that is different from the FPC rate, and the Supreme Court of Kansas offered no valid reason whatsoever for ignoring those statutory rates. Neither has this Court suggested a colorable argument that could support the Kansas court's decision, and its affirmance of that decision effectively converts an important constitutional guarantee into a precatory admonition.

The Kansas courts have applied equitable principles to justify their choice of the FPC interest rate in this and analogous cases. See *ante,* at 720–722; *Phillips Petroleum Co.* v. *Shutts,* 472 U. S. 797, 816 (1985) *(Shutts III).* In *Shutts III,* we noted that "Oklahoma would most likely apply its constitutional and statutory 6% interest rate rather than the much higher Kansas rates applied in this litigation"; that "Texas has never awarded any such interest at a rate greater than 6%, which corresponds with the Texas constitutional and statutory rate"; and that "[t]he Kansas interest rate also conflicts with the rate which is applicable in Louisiana." *Id.,* at 817, and n. 7. We supported each of these propositions with appropriate citations to state law, but remanded the case so that the Supreme Court of Kansas could provide "a more thoroughgoing treatment" of the apparent conflicts between its law and the law of the other three States. *Id.,* at 818. We then vacated the judgment in the present case and remanded for reconsideration in light of *Shutts III.* See *Sun Oil Co.* v. *Wortman,* 474 U. S. 806 (1985) *(Wortman II).*

On remand, the Supreme Court of Kansas considered the *Shutts* case first, and then applied the conclusions reached

there in the case before us today. See *Shutts* v. *Phillips Petroleum Co.*, 240 Kan. 764, 732 P. 2d 1286 (1987) *(Shutts IV)*; 241 Kan. 226, 229, 755 P. 2d 488, 490–491 (1987) (opinion below). When one reviews the reasoning of the Kansas court, an undertaking that the majority omits without explanation, that court's failure to give full effect — or any effect — to the laws of its sister States becomes unmistakable.

Adhering to its equitable theory of unjust enrichment, which it now claimed would be adopted by each of the States whose laws it purported to apply, the Kansas court concluded:

> "Under equitable principles, the states would imply an agreement binding [the oil and gas company] to pay the funds held in suspense to the royalty owners when the FPC approved the respective rate increases sought by [the company], together with interest at the rates and in accordance with the FPC regulations found in 18 CFR § 154.102 (1986) to the time of judgment herein. These funds held by [the company] as stakeholder originated in federal law and are thoroughly permeated with interest fixed by federal law in the FPC regulations . . . ." *Shutts IV, supra*, at 800, 732 P. 2d, at 1313.

This conclusion was not supported with so much as a single colorable argument. The Kansas court, for example, took note of the following Texas statute:

> "'When no specified rate of interest is *agreed upon by the parties*, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable.'" 240 Kan., at 777, 732 P. 2d, at 1298 (quoting Tex. Rev. Civ. Stat. Ann., Art. 5069–1.03 (Vernon 1987)) (emphasis added).

This statute was held inapplicable for the following reason. "No Texas court ever mentioned the higher rates set by federal regulations to which [the oil and gas company] had

agreed to comply in its corporate undertaking. *This issue has not been determined by the Texas Supreme Court.*" 240 Kan., at 777, 732 P. 2d, at 1298 (emphasis in original; citations omitted). Thus, the only reason suggested for ignoring the contrary language of the Texas statute was that the Texas Supreme Court had not specifically rejected the Kansas equitable theory. The court cited no case in which the Kansas theory had ever been proposed to the Texas courts; no case suggesting that the Texas courts would "imply an agreement" by the parties to adopt the FPC rates in these circumstances; and no case from *any* jurisdiction adopting the Kansas theory under which the funds in question were "thoroughly permeated with interest fixed by federal law." In sum, the Kansas court offered not a single affirmative reason for supposing that the Texas courts would adopt the Kansas theory in the face of the contrary language of the Texas statute.

The Supreme Court of Kansas dealt with the following Oklahoma statute in an equally unsatisfactory manner.

> " 'The legal rate of interest shall be six percent (6%) in the absence of any contract as to the rate of interest, and *by contract the parties may agree* to any rate as may be authorized by law, now in effect or hereinafter enacted.'" *Id.*, at 784, 732 P. 2d, at 1302 (quoting Okla. Stat., Tit. 15, § 266 (1981)) (emphasis added).

The Kansas court's entire discussion of this statute was as follows:

> "In the above cases where interest was awarded, the applicable rate was six percent. However, in *First Nat. Bank* v. *Cit. & So. Bank*, 651 F. 2d 696 (10th Cir. 1981), applying Oklahoma law, a federal circuit court awarded interest at the rate of ten percent as provided in the promissory note and rejected the argument that interest must be limited to Oklahoma's legal rate of six percent. Therefore, in equity, the corporate undertaking entered

into by [the oil and gas company] and the FPC would probably be viewed by implication as contractual by the Oklahoma courts and the rates required in 18 CFR § 154.102 (1986) would be imposed, rather than the statutory six percent." 240 Kan., at 784, 732 P. 2d, at 1302.

The court did not explain why it thought that Oklahoma law could properly be inferred from a decision by a federal court. Nor did the court explain why an express agreement in a promissory note should be considered equivalent to the fictional or "implied" agreement that the court chose to find in the case before it. (In *First Nat. Bank of Hominy, Okla.* v. *Citizens and Southern Bank of Cobb Cty., Marietta, Ga.*, 651 F. 2d 696 (CA10 1981), the defendant was the guarantor of the obligation evidenced by the promissory note.) Once again, the Kansas court read its theory of unjust enrichment into another State's law without a shred of affirmative support for doing so.

The applicable Louisiana statute provided that " '[a]ll debts shall bear interest at the rate of seven percent per annum from the time they become due, *unless otherwise stipulated.*'" 240 Kan., at 791, 732 P. 2d, at 1307 (quoting La. Civ. Code Ann., Art. 1938 (West 1977)) (emphasis added). After discussing three irrelevant federal decisions, the Kansas court concluded: "We find Louisiana would apply the FPC rates of interest under equitable principles. *Whitehall Oil Co.* v. *Boagni*, [255] La. 67." 240 Kan., at 793, 732 P. 2d, at 1308. *Boagni*, a 1969 decision of the Supreme Court of Louisiana, does not support the proposition for which it was cited. In that case, an oil and gas company was permitted to recover royalties from its lessors after the FPC revised downwards the gas prices to which the royalties were tied. The Louisiana court reached this conclusion by applying equitable principles "to determine conflicting claims under a contract where there is *neither* express law *nor* contractual provisions governing a determination of them." 255 La. 67, 74, 229 So. 2d 702, 704 (1969) (emphasis added). This holding does not

in any way support the proposition that the Louisiana courts would apply equitable principles to reach a result contrary to that dictated by the language of a Louisiana statute. Thus, the Supreme Court of Kansas again concluded that one of its sister States would decline to apply its own statute, and the Kansas court again failed to offer any colorable support for its conclusion.

At bottom, the Kansas court's insistence on its equitable theory seems based on nothing more than its conviction that it *would* have been "fair" for the parties to agree that the oil and gas company should pay the same interest rates for suspended royalty payments arising from approved price increases that the company would have had to pay its customers for refunds arising from disapproved price increases. That is a wholly inadequate basis for concluding that three other States would conclude that the parties *did* make such an agreement. Even assuming that the result imposed on the parties by the Kansas court was "fair," which is not at all obvious, neither that court nor this Court has given any reason for concluding that the parties to the case before us agreed either to adopt the FPC interest rates or to be bound by the Kansas judiciary's notions of equity.

The majority does not discuss the Kansas court's analysis of its sister States' statutes, which clearly indicate that rates of 6% or 7% were applicable. Indeed, the Court appears to think that no analysis was necessary because the Kansas court was not bound by the language of the statutes with which it was confronted. See *ante*, at 732, n. 4 ("Relief cannot be granted in this Court unless *decisions* plainly contradicting the Kansas court's interpretations were brought to the Kansas court's attention" (emphasis added; citations omitted)). This suggestion is inconsistent with the language of the Full Faith and Credit Clause and is not dictated by the holding in any of our previous cases. Nor is the Court on firmer ground when it imagines that the Kansas court merely read "standard contract law" into the statutes of its sister

States. *Ibid.* The "industry practice" of complying with FPC regulations where they are applicable hardly implies an "industry usage" or "common understanding" under which the terms of those regulations are to be applied in other situations where they are *not* applicable. Neither the Kansas court nor this Court has pointed to a single instance—let alone an "industry practice"—in which an oil company and its lessor agreed that the FPC interest rates would apply in circumstances like those presented here. Unless "industry usage" means "practices that the Supreme Court of Kansas thinks are fair," neither standard contract law nor standard logic will support the majority's attempted defense of the Kansas court's result.

Today's decision discards important parts of our decision in *Shutts III*, 472 U. S. 797 (1985), and of the Full Faith and Credit Clause. Faced with the constitutional obligation to apply the substantive law of another State, a court that does not like that law apparently need take only two steps in order to avoid applying it. First, invent a legal theory so novel or strange that the other State has never had an opportunity to reject it; then, on the basis of nothing but unsupported speculation, "predict" that the other State would adopt that theory if it had the chance. To call this giving full faith and credit to the law of another State ignores the language of the Constitution and leaves it without the capacity to fulfill its purpose. Rather than take such a step, I would remand this case to the Supreme Court of Kansas with instructions to give effect to the interest rates established by law in Texas, Oklahoma, and Louisiana. I therefore respectfully dissent.