No. 66,276
No. 66,444

JERRY D. VANIER, d/b/a VANIER, *Appellee*, v. WILLIAM R. PON-SOLDT, d/b/a PEGASUS RANCH; PEGASUS RANCH, INC.; and BE-THESDA FARM, INC., *Appellants*.

(833 P.2d 949)

Opinion filed May 22, 1992.

*Charles R. Hay*, of Goodell, Stratton, Edmonds & Palmer, of Topeka, and *George W. Yarnevich*, of Kennedy, Berkley, Yarnevich & Williamson, Chtd., of Salina, argued the cause, and *Robert Sweetapple*, of Sweetapple, Broeker & Varkas, P.A., of Boca Raton, Florida, was with them on the brief for appellants.

*Norman R. Kelly*, of Norton, Wasserman, Jones & Kelly, of Salina, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

HERD, J.: This is an action to foreclose a security agreement against which a counterclaim was asserted. Jerry D. Vanier, d/b/a Vanier, a resident of Kansas, sold an Arabian stallion to William R. Ponsoldt, d/b/a Pegasus Ranch, and Pegasus Ranch, Inc., Florida residents, at an auction in Kentucky. Vanier brought this action against Ponsoldt for failing to make payments according to the note and purchase agreement. Ponsoldt filed a counterclaim alleging fraud in the conduct of the auction, misrepresentations as to the horse's condition and qualities, and breach of warranty.

The trial court found for Vanier on his action and the counter-claim. Ponsoldt appeals.

The facts out of which this dispute arose are extensive and are recited in detail for a proper analysis of the issues of law. The trial court made findings of fact which are not challenged and are supported by substantial competent evidence; thus, they will not be disturbed on appeal.

Vanier, of Salina, owned several Arabian horses, including a stallion called Lech Pasb, foaled March 23, 1984. Vanier had a longstanding business relationship with Lasma Arabians Limited (Lasma) which operated an auction and breeding facility, L'Esprit Sale Center, in LaGrange, Kentucky. Lasma also has a facility in Scottsdale, Arizona. Over the years, Vanier purchased and sold several million dollars worth of horses at various Lasma auctions.

In the spring of 1985, Eugene E. LaCroix, an employee of Lasma, approached Vanier about placing his Arabian horses in an auction to be conducted in late summer at LaGrange. LaCroix particularly wanted Lech in the sale because he was an outstanding yearling stallion with good Polish Arabian bloodlines, a much desired ancestry. Vanier decided to put Lech in the Star Stallion Auction and transported Lech to LaGrange in May 1985. It was Lasma's practice that once a stallion was entered in an auction he was thereafter in the care of Lasma, whose employees were responsible for his care and preparing him for the auction.

In early 1985, Ponsoldt purchased 250 acres near Okeechobee, Florida, and began investigating the possibility of establishing an Arabian horse operation as a family business. Prior to this time Ponsoldt had been a real estate broker and had various business interests including meat packing, medical products, valves, water treatment, and heating and air conditioning. Ponsoldt is an experienced and knowledgeable businessman acquainted with complicated financial and business transactions.

Ponsoldt let it be known he intended to invest $5 million in Arabian horses. Thereafter, he was besieged with attention from Arabian horse owners. Armand Hammer, the late Occidental Petroleum mogul, flew Ponsoldt around in his jet and he was courted for his business by Alec Courtelis, who turned out to be an associate of LaCroix. In July 1985, Ponsoldt visited the Lasma facility in Kentucky. Ponsoldt was introduced to LaCroix, whom

Ponsoldt also told he was considering investing up to $5 million in Arabian horses. LaCroix told Ponsoldt Lasma could provide important services. He advised Ponsoldt to buy Arabians at auction rather than by private treaty. LaCroix invited Ponsoldt to attend his seminar and mock auction preceding the August sales. He also told Ponsoldt he wanted to give him bidding advice as to what horses to buy and that he wanted to make certain Ponsoldt had the best advice and would buy from Lasma. Ponsoldt and his wife attended a mock auction held August 29, 1985, and were informed there would be no reserve bidding at that weekend's auctions. LaCroix further gave Ponsoldt written bidding recommendations regarding the horses he should buy and recommended price ranges he should pay.

Prior to Lech being sent to Kentucky in May 1985, veterinarian Stan O'Neil performed an insurance examination and did not note any swelling or lameness in Lech's hocks. Once the horse arrived in Kentucky, Dr. Patrick Moloney performed pre-sale veterinarian examinations on Lech and he also found no swelling in Lech's hocks or lameness. On August 27, 1985, William Hemminger, a veterinarian hired by Lasma, prepared a pre-sale examination and report indicating Lech was in good health except he showed a "[s]mall amount of joint effusion both hocks." Dr. Hemminger testified the effusion "wasn't grossly obvious like a bog spavin" and he did not recommend treatment or see the horse again after the examination.

On August 28, 1985, another veterinarian hired by Lasma saw Lech. This was the fourth veterinarian to examine Lech between May and the date of sale. Dr. Roger Magnusson noted Lech's left hock was abnormally filled with fluid. Dr. Magnusson diagnosed a chronic bog spavin i.e. "not acute or mild." That day, Dr. Magnusson tranquilized Lech and drained the excessive sinovial fluid from the horse's left hock. The veterinarian then injected the hock with a corticosteroid. For the next three days Dr. Magnusson administered Butazolidine into the horse's jugular vein. This procedure was to prevent any rebound effusion of Lech's hock. Dr. Magnusson believed Lech responded well to his treatment and further believed the condition he was treating was more cosmetic than functional and that the horse was not lame. Dr. Magnusson testified osteochondrosis (OCD) lesions are

the leading cause of what is often diagnosed as bog spavin. Dr. Magnusson initially billed Lasma for his services but was advised to send his invoice to Vanier, who later paid for the services.

It is essential to know something about OCD, a medical condition which afflicts horses, to fully understand this case. OCD indicates a dissecting flap or the loosening of a piece of bony cartilage inside a horse's hock. The hocks are the joints midway up the horse's hind legs. OCD primarily affects young horses, weanlings, and yearlings. Swelling in the hock is a common symptom of OCD; this swelling is often referred to as "bog spavin." In contrast to OCD being caused by a loosening of cartilage or a bone chip, bog spavin is generally caused by degenerative arthritis. OCD is treatable and the success rate is very high. The plaintiff in this case concedes a bog spavin or OCD affects the value of an Arabian showhorse and its chances of success in the show ring.

Lech was sold at the Star Stallion Auction on August 31, 1985. The pre-auction catalog for the Star Stallion Auction stated: "These are the best five colts and stallions available in the country today." LaCroix advised Ponsoldt that if he purchased Lech the stallion could stand stud at the prestigious Lasma stallion barn and all Lech's show expenses would be paid by Lasma. Furthermore, Ponsoldt would receive 15 free breedings from Lech to mares of Ponsoldt's choosing; Ponsoldt would be allowed to breed other mares to Lech for a $750 per mare stud fee; Lech would be bred at $5,000 per breeding stud fee to an estimated minimum of 30 outside mares the first year after which the fee would be raised; Ponsoldt would receive 20% of the outside stud fees from breedings to Lech; earnings would be sufficient to pay the installment purchase payments for Lech; and Lasma would handle the breeding. LaCroix further advised Ponsoldt that if he was unhappy with Lech, Lasma would purchase the horse. LaCroix also advised Ponsoldt he should purchase Lech because the horse was an exceptional stallion. LaCroix stated that in his opinion Lech was a fantastic buy worth over $1 million but was a bargain at $500,000.

As a potential buyer, Ponsoldt could have examined Lech prior to the auction or could have arranged for a veterinarian to examine Lech before or after the auction. Ponsoldt chose not to do so.

Prior to the auction, Ponsoldt received the pedigree document on Lech, a copy of the terms and conditions of the auction sale document, and a document concerning the warranties of fertility. Ponsoldt never asked to see the promissory note or security agreement for Lech although these were available for inspection prior to the auction. Ponsoldt acknowledges the pre-sale veterinarian examination and health report prepared by Dr. Hemminger was also available to him at the auction. He now states he did not take advantage of the opportunity to examine the report and claims misrepresentation. Jackie Teske, Ponsoldt's secretary, testified Ponsoldt received Dr. Hemminger's independent veterinarian examination report that noted a small amount of joint effusion in both hocks soon after the auction. Ponsoldt made no complaint at the time.

The day before the Star Stallion Auction, Ponsoldt attended other auctions. He successfully bid on numerous yearlings and mares, spending hundreds of thousands of dollars. During one of these auctions, Ponsoldt noticed LaCroix bidding against him for a mare, Miss TNT, which LaCroix succeeded in buying. Ponsoldt was shocked and upset by LaCroix's conduct because he believed it to be a conflict of interest. Ponsoldt believed LaCroix was his confidant and advisor. Ponsoldt confronted LaCroix about his concerns and LaCroix offered to sell him Miss TNT if Ponsoldt was upset. Although there was conflicting testimony on this fact, the trial court found LaCroix also informed Ponsoldt he would not bid against him at the Star Stallion Auction.

During the bidding on Lech, neither Ponsoldt nor his wife and children could see anyone else bidding once the price passed $80,000 to $100,000. Mr. and Mrs. Ponsoldt discussed this fact soon after the sale. Lech eventually was sold to Ponsoldt for $250,000. The trial court found Lech had a fair market value at the time of the sale in excess of $250,000. Teske testified that a couple of months after the auction Ponsoldt told her he believed the auction of Lech had been fraudulently conducted.

During the Star Stallion Auction, LaCroix was located in an electrical lighting booth at the back of the auditorium, elevated 30-40 feet above the floor. The booth is an enclosed room with a glass front. LaCroix was "wired" to individuals near the auctioneer, including the auctioneer's wife. The trial court found

LaCroix placed secret bids for Lech in opposition to Ponsoldt, contrary to Kentucky law and public policy.

Between 1985 and 1987 Ponsoldt and LaCroix continued a business relationship. LaCroix went on advising Ponsoldt on horses to buy and recommended that prices. During this time Ponsoldt and LaCroix attended at least three horse sales at which LaCroix bid on horses he had recommended that Ponsoldt try to acquire. Finally, in February 1987, at Lasma's Star World Company auctions in Scottsdale, Arizona, Ponsoldt observed LaCroix in a small room not visible to the audience; LaCroix had a headset on and was talking to the auctioneer's wife and instructing her. Ponsoldt watched while four horses went across the stage and the bid on three of the four horses increased. Ponsoldt, personally or through his companies, owned horses sold at this auction, thus receiving the benefit of the secret bids. He, however, did not return any of the sale prices nor agree to rescind the auction sale of any of the horses sold for him.

Ponsoldt received possession of Lech immediately after the 1985 sale. He also executed a promissory note and an installment purchase and security agreement. Ponsoldt personally issued a check for $50,000 as a down payment on Lech and, thus, the promissory note was for the balance of the purchase price, $200,000. The agreements provided for the remaining $200,000 to be paid in 9 equal semi-annual installments at an interest rate of 11% per annum beginning September 1, 1986. Ponsoldt later made payments pursuant to the terms of the agreements in the amounts of $44,222.22 on August 29, 1986, and $32,000 on March 10, 1987.

The installment purchase and security agreement provided in part:

"15. APPLICABLE LAW, JURISDICTION, VENUE AND ATTORNEYS' FEES: This contract shall be construed and governed by the laws of the state indicated above the signature lines [Kentucky]. At the option of Seller, jurisdiction and venue for any dispute arising under or in relation to this contract shall lie only in the Seller's state and county as set forth in paragraph 1 above [Saline County, Kansas]. In the event lawsuit is brought with respect to this contract (or seller repossesses), the prevailing party shall be entitled to reasonable attorneys' fees."

Despite the security agreement's provision, which states: "Buyer agrees to keep the Horse free of all liens and incumbr-

ances," Ponsoldt sold a one-half interest in Lech to Bethesda Farm, Inc., (Bethesda) of California and Lasma in December 1985. In exchange for this one-half interest, Ponsoldt was given fractional interest No. 22 in the Strike syndicate agreement. Strike was a champion Arabian stallion at that time. Fractional interests in the Strike syndicate agreement at that time were selling for $225,000 on the open market. Bethesda and Lasma purchased an interest in Lech even though they were aware the horse had effusion or swelling in his left hock. Lasma ultimately transferred its 25% interest in Lech to Bethesda. Vanier was unaware of the agreements between Ponsoldt and Bethesda-Lasma. Ponsoldt did not obtain Vanier's written permission or authority to sell an interest in Lech, contrary to the security agreement.

Lech was kept in Kentucky for a short time after the sale. Ponsoldt then sent him to the Lasma facility in Arizona and eventually to Bethesda in California to stand stud. In 1986, Lech bred 24 mares. In 1987, Lech bred at least 20 mares. Most of these mares were owned by Pegasus Ranch, Inc., (PRI) a business interest of Ponsoldt's incorporated in Florida on September 26, 1985, or horses owned by employees of PRI. In 1988, Lech bred at least 18 mares. Lech produced a very high percentage of fillies versus colts, a desirable trait in a stallion. Ponsoldt was pleased by this and impressed by the overall quality of Lech's offspring. Lech had an 87% foaling rate in 1986. According to veterinarian John C. Bigley, this foaling rate is good.

Lech's breeding commitments precluded him from competing in shows. In early 1986, however, Lech entered a two-year-old class show and was named Junior Champion Stallion. Lech was also judged best of the winners of the young stallions at the show.

Greg Gallun of Bethesda was the trainer in charge of Lech from approximately December 1985 through February 1987. Upon his arrival at Bethesda, Lech had some degree of minor swelling in the left hock area. Ponsoldt personally observed Lech at Bethesda on December 14, 1985. The swelling in Lech's hocks was apparent on visual inspection of the horse at that time. Greg Gallun was not concerned about the swelling.

In January 1986, a veterinarian was called to drain Lech's hock prior to showing him. According to Greg Gallun, this was a standard procedure with other animals in similar situations. From

July to December 1986, the condition of Lech's hocks did not noticeably change. While at Bethesda, Lech's hocks appeared to have moderate to small bog spavin, with slightly more fluid in the left hock than the right. Teske testified Ponsoldt received a bill from Alamo Pintado Equine Clinic in July 1986 for drainage and treatment of Lech's left hock.

In February 1987, Ponsoldt asked Brad Gallun and Greg Gallun of Bethesda to send Lech to Ponsoldt so the stallion could breed mares in Florida. Upon arriving at Pegasus Ranch in the spring of 1987, problems with Lech's left hock were conservatively treated by a local veterinarian, Dr. Kerry McGehee. McGehee continued treating Lech's left hock as a cosmetic blemish and noted Lech did not appear to be lame. In September 1987, McGehee took a radiograph of Lech's hock and observed a free-floating bone fragment within the joint, known as joint mice. In November 1987, Lech was taken to the University of Florida Veterinary Hospital where a diagnosis of OCD of the left hock was made. Dr. Alan Nixon, a veterinary surgeon, removed a bone chip from the hock. Despite the surgery, Lech has since had chronic swelling in the left hock.

If a radiograph had been taken prior to the August 1985 auction, it would have revealed an OCD lesion. Taking a radiograph is not customary and, thus, it was not unreasonable for either the seller or potential buyers not to do so. Despite his problems with OCD there has never been any indication of Lech developing arthritis in his left hock. In June 1987, Ponsoldt sent a lengthy letter to LaCroix and Brad Gallun detailing numerous complaints as to transactions, representations, and costs. Ponsoldt did not mention any swelling in Lech's left hock or a concern as to his soundness. Additionally, Ponsoldt did not send a copy of the letter to Vanier.

Plaintiff's expert, Dr. Lawrence Bramlage, testified Lech had undiagnosed OCD prior to the Star Stallion Auction. The excessive fluid in the hock diagnosed by Dr. Magnusson at LaGrange is a common symptom of OCD. Dr. Bramlage further testified that in his opinion Lech was sound when examined immediately prior to the sale. Swelling of hocks in yearlings is not unusual, and without a medical history, OCD would not be reasonably

anticipated. Furthermore, swelling or a bog spavin would not cause an examiner to conclude the existence of OCD.

The fair market value of Arabian horses dropped significantly between late 1985 and February 1987.

Almost immediately after purchasing Lech, Ponsoldt began attempting to trade or barter land, products, mares, or stud services in exchange for payment of the balance owed Vanier on Lech. Although Ponsoldt had previously made a payment on Lech, he did not make the $32,000 payment in March 1987 until after Vanier sent a default notice to him. In August 1987, an employee of Ponsoldt wrote Vanier and renewed Ponsoldt's offer to negotiate a trade for the balance of the note owed on Lech. When Ponsoldt did not make the September 1, 1987, payment, Vanier sent him a default notice stating payment for Lech had to be made within 15 days of the demand or payment of the note in full would be due. Ponsoldt, however, did not respond to this demand.

In October 1987, Vanier filed suit against Ponsoldt, Lasma, and Bethesda. Vanier claimed Ponsoldt owed him the balance due on the note, $155,555.56, plus interest. Vanier also requested foreclosure on Vanier's security interest in Lech, and a determination of the claims and obligations of Lasma and Bethesda with respect to Lech. In addition, Vanier prayed for attorney fees pursuant to the security agreement.

Initially Ponsoldt made a special appearance solely for the purpose of requesting dismissal for lack of personal jurisdiction. Ponsoldt's motion was denied and he filed his answer in January 1988. With his answer, Ponsoldt filed a counterclaim alleging fraud in the conduct of the auction, misrepresentations as to the horse's condition and qualities, and breach of warranty.

Ponsoldt's business relationship with Lasma continued to be good through late 1987 and early 1988. In November 1987, Ponsoldt consigned and sold his horses at Lasma auctions. Ponsoldt further agreed to sell his horses at Lasma auctions in February 1988. Ponsoldt later withdrew these horses from the February auction because of a dispute with Lasma over payments of bills and commissions from the November sale. Despite these transactions, Ponsoldt filed an affidavit in response to Vanier's motion for summary judgment, stating he believed he was "defrauded"

by alleged auction fraud at the auction sale of Lech. Ponsoldt gave the same testimony at trial.

In February 1988, after the filing of this suit, Ponsoldt wrote at least three letters to individuals attempting to rescind the purchase of other horses he had bought. Each letter alleged fraud in the sale of the horse. The settlements proposed by Ponsoldt included an offer to trade breedings of Lech.

In July 1988, Lasma filed a chapter 11 bankruptcy proceeding and, therefore, was granted an automatic stay in these proceedings. At the pretrial conference the parties agreed to bifurcate the litigation between Bethesda and either Vanier or Ponsoldt from litigation between Vanier and Ponsoldt. Therefore, the trial court only addressed the issues between Vanier and Ponsoldt at trial.

Following a trial to the bench, the trial court found Kentucky law governed the transaction. The trial court further found Ponsoldt breached the terms and conditions of the installment purchase and security agreement when on December 1, 1985, he sold an undivided one-half interest in Lech to Lasma and Bethesda without the written consent of Vanier. Ponsoldt also violated the agreement when he failed to make the September 1, 1987, payment in a timely fashion. The trial court held Vanier was entitled to judgment in the amount of $155,555.56, with interest at the rate of 18% per annum. The trial court also awarded Vanier $88,814.36 for attorney fees.

The trial court further found Ponsoldt, d/b/a Pegasus Ranch, was personally and individually liable for the judgment and attorney fees. The auctioneer sold Lech to Ponsoldt as an individual. Although the installment purchase and security agreement does indicate he was doing business as Pegasus Ranch, Ponsoldt signed the promissory note without any indication that he was acting on the part of any other entity. Moreover, Ponsoldt did not incorporate PRI until the month following his purchase of Lech. Ponsoldt does not now challenge the trial court's finding that PRI was not liable, and, therefore, we consider each issue on appeal to be raised by Ponsoldt as an individual.

As to Ponsoldt's counterclaims, the trial court found LaCroix had committed auction fraud in the sale of Lech and had made misrepresentations to Ponsoldt. The court, however, found Pon-

soldt had waived his rights to complain about LaCroix's misdeeds by affirming the sale contract and sitting on his right to bring suit. The court further held Ponsoldt was put on notice of any breach of warranties as to Lech's health at the time of the sale. Again, the trial court found Ponsoldt had waited too long to bring suit for breach of warranty.

## I.

Ponsoldt first argues the trial court did not have personal jurisdiction over him because the jurisdiction and forum-selection clause found in paragraph 15 of the installment purchase and security agreement is invalid. He further claims the district court did not have jurisdiction under the long arm statute, K.S.A. 1991 Supp. 60-308.

The United States Supreme Court held a contractual forum-selection clause valid in *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 32 L. Ed. 2d 513, 92 S. Ct. 1907 (1972). In *The Bremen*, Zapata, a Houston-based American corporation, contracted with Unterweser, a German corporation, to tow Zapata's ocean-going drilling rig from Louisiana to a point off Italy in the Adriatic Sea. The contract contained the following provision: "Any dispute arising must be treated before the London Court of Justice." When a severe storm damaged the drilling rig, Zapata filed a suit in admiralty in the United States District Court in Florida. 407 U.S. at 2-4. The district court denied Unterweser's motion to stay the Florida suit pending resolution of the controversy by the High Court of Justice in London. 407 U.S. at 6.

Historically forum-selection clauses were found to be contrary to public policy and, therefore, unenforceable. 407 U.S. at 9. The United States Supreme Court, however, noted a trend toward accepting forum-selection clauses. The Court stated:

"The threshold question is whether [the district court] should have exercised its jurisdiction to do more than give effect to the legitimate expectations of the parties, manifested in their freely negotiated agreement, by specifically enforcing the forum clause.

"There are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power, such as that involved here, should be given full effect." 407 U.S. at 12-13.

The Court concluded the forum-selection clause should have been enforced unless Zapata could clearly show "enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." 407 U.S. at 15.

The rule announced in *The Bremen* was applied in *Carnival Cruise Lines v. Shute*, 499 U.S. ___, 113 L. Ed. 2d 622, 111 S. Ct. 1522 (1991). There, the Court again addressed the enforceability of a forum-selection clause in a contract between a cruise line and its passengers. The clause appeared on the face of each ticket and stated in part: " 'It is agreed by and between the passenger and the Carrier that all disputes and matters whatsoever arising under, in connection with or incident to this Contract shall be litigated, if at all, in and before a Court located in the State of Florida, USA, to the exclusion of the Courts of any other states or country.' " 113 L. Ed. 2d at 628. Upon finding the passengers had been given notice of the forum-selection provision and that their accession to the forum-selection clause was not obtained by fraud or overreaching, the Court held the exercise of jurisdiction by the passengers' state, Washington, was improper. 113 L. Ed. 2d at 633. The application of the rule in *The Bremen* has not been limited to admiralty cases. See *Saul Stone & Co. v. Browning*, 593 F. Supp. 343, 345 (N.D. Ill. 1984); *Intermountain Systems, Inc., v. Edsall Const. Co.*, 575 F. Supp. 1195, 1197 (D. Colo. 1983); *Public Water, Etc. v. American Ins. Co.*, 471 F. Supp. 1071, 1072 (W.D. Mo. 1979). Nor has its application been limited to federal courts. See *SD Leasing, Inc. v. Al Spain & Assoc., Inc.*, 277 Ark. 178, 181, 640 S.W.2d 451 (1982); *Clinic Masters v. Dist. Ct.*, 192 Colo. 120, 123, 556 P.2d 473 (1976); *Chase Third Century Leasing v. Williams*, 782 S.W.2d 408, 412 (Mo. App. 1989).

In *National Equip. Rental, Ltd. v. Taylor*, 225 Kan. 58, 587 P.2d 870 (1978), the plaintiff, a New York resident, took a default judgment in New York against the defendant, a Kansas resident. When the plaintiff attempted to enforce the judgment in Kansas, the trial court dismissed the action upon finding there were " 'insufficient contacts with the Defendant for the New York court to acquire jurisdiction.' " 225 Kan. 58. The lease agreement between the plaintiff and the defendant provided in part: " 'Lessee

agrees that all actions or proceedings arising directly or indirectly from this lease shall be litigated only in courts having situs within the State of New York and the Lessee hereby consents to the jurisdiction of any local, state or federal court located within the State of New York.' " 225 Kan. at 60. On appeal, we found the transaction bore a reasonable relationship to New York and stated the "[p]arties had the right to agree that New York would be the forum for determining any disputes arising out of the contract." 225 Kan. at 61. Therefore, the trial court's analysis of personal jurisdiction based upon sufficient contacts was erroneous. Ultimately, however, we found New York did not have personal jurisdiction over the defendant because he had not received proper notice.

Ponsoldt does not claim the forum-selection clause was entered into due to fraud or overreaching. Instead, Ponsoldt contends he did not read the agreement and that the clause was "[b]uried in the mass of type on Page 4." Although Ponsoldt was new to the horse trading business, he was an experienced and astute businessman. In Kentucky, one who can read and has an opportunity to read a contract he signs must abide by the terms of the contract. *Murphy v. Torstrick*, 309 S.W.2d 767, 770 (Ky. 1958). Furthermore, it is the duty of every contracting party to learn and know the contents of a contract before signing it. *Commercial Credit Corporation v. Harris*, 212 Kan. 310, 314, 510 P.2d 1322 (1973).

We find the forum-selection clause fair and reasonable. The forum selected is the home of one of the parties to the contract and, thus, has a reasonable relationship to the transaction. We hold Ponsoldt voluntarily consented to personal jurisdiction in Saline County, Kansas, by entering into the installment purchase and security agreement with Vanier. Because Ponsoldt consented to personal jurisdiction and does not now claim he was not given proper notice of the cause of action, we need not discuss K.S.A. 1991 Supp. 60-308, the long arm statute. Again, by Ponsoldt consenting to jurisdiction, we need not determine whether Ponsoldt has sufficient minimum contacts with Kansas to satisfy constitutional concepts of fundamental fairness. We hold the district court of Saline County has personal jurisdiction over Ponsoldt.

## II.

Ponsoldt requested a jury trial in his amended answer, counterclaim, and cross-claim, which the trial court denied. Ponsoldt now claims the trial court's denial was erroneous. For support, Ponsoldt first cites the Seventh Amendment to the United States Constitution and argues that if the case had been removed to federal court he would have been given a jury trial.

The fact is this action was not removed to the federal court. The Seventh Amendment has not been applied to the states through the Fourteenth Amendment. *Leiker v. Gafford*, 245 Kan. 325, 362, 778 P.2d 823 (1989); *First Nat'l Bank of Olathe v. Clark*, 226 Kan. 619, 622, 602 P.2d 1299 (1979). Thus, we do not address this issue.

Ponsoldt argues § Seven of the Kentucky Constitution Bill of Rights applies, which provides: "The ancient mode of trial by jury shall be held sacred, and the right thereof remain inviolate, subject to such modifications as may be authorized by this Constitution."

The Kentucky courts have stated, "The fundamental right to a trial by jury, when a proper demand is made, is recognized by the Kentucky Constitution in § Seven, and incorporated into the Kentucky Rules of Civil Procedure, Rule 38.01." *Whitfield v. Cornelius*, 554 S.W.2d 870, 871 (Ky. App. 1977), *rev. denied* 563 S.W.2d 9 (Ky. 1978). The Kentucky Court of Appeals has further stated: "Where both legal and equitable issues are involved in a lawsuit, the legal issues should be tried by a jury if proper demand is made." *Brandenburg v. Burns*, 451 S.W.2d 413, 414 (Ky. 1970).

Vanier contends § Five of the Kansas Constitution Bill of Rights applies. It provides: "The right of trial by jury shall be inviolate." In Kansas, the right to a jury trial is more narrowly applied than in Kentucky. Here, the right to trial by jury applies to legal claims but not to actions which are essentially equitable in nature. *First Nat'l Bank of Olathe*, 226 Kan. at 622-23.

In this action Kansas procedural law applies and Kentucky substantive law applies. Thus, the questions are (1) whether the right to a jury trial is procedural or substantive, and (2) whether

the applicable state law, either Kansas or Kentucky, requires a jury trial under the facts presented.

The Restatement of Conflict of Laws § 594 (1934) provides: "The law of the forum determines whether an issue of fact shall be tried by the court or by a jury." The Restatement (Second) of Conflict of Laws § 129 (1969) states: "The local law of the forum determines whether an issue shall be tried by the court or by a jury." Professor Robert A. Leflar further confirms this rule. He has written:

"The method of trial of a case, that is, whether by court or jury, seems to be a matter of procedure rather than of substantive rights, and the weight of authority so holds. Even though it be entirely possible that a jury might arrive at a different conclusion than would a judge trying the same fact issue, the legal rights of the parties to the issue depend upon the facts and the law as they exist prior to the trial, whereas this possible difference in result depends upon the manner of conducting the trial." Leflar, American Conflicts Law § 122, 242 (3d ed. 1977).

Professor Leflar notes some authority to the contrary of this general rule. Those cases, however, deal with contributory negligence, mode of levying execution, and other matters that are not applicable here.

Ponsoldt admits "[b]lack letter law suggests that the law of the forum determines whether an issue shall be tried by the court or by a jury." He, however, goes on to argue Kentucky law should apply. Ponsoldt argues inter alia that by denying him a right to a jury trial any judgment awarded Vanier may not be honored if Vanier attempts to execute the judgment outside this state because the foreign state would not have to honor Vanier's judgment under the Full Faith and Credit Clause. To support his contention, Ponsoldt cites *Sun Oil Co. v. Wortman,* 486 U.S. 717, 100 L. Ed. 2d 743, 108 S. Ct. 2117 (1988). In that case, the United States Supreme Court addressed whether the Full Faith and Credit Clause required a forum state court to apply the statute of limitations from the state whose substantive law applied to the suit. The Court stated: "Since the procedural rules of [the forum state's] courts are surely matters on which a State is competent to legislate, it follows that a State may apply its own procedural rules to actions litigated in its courts." 486 U.S. at 722.

Because there is no dispute in the applicable case law or other authorities that the law of the forum determines whether a right to a jury trial exists, we are not persuaded by Ponsoldt's arguments. Thus, Kansas law must be used to determine whether Ponsoldt should have been given a jury trial. Section Five of the Kansas Constitution Bill of Rights guarantees a right to jury trial as that right existed at common law. At common law, a party was not entitled to a jury trial as a matter of right in equity suits. We have stated: "In determining whether an action is one in equity the test is whether the essential nature of the action is grounded on equitable rights and is one in which equitable relief is sought." *Karnes Enterprises, Inc. v. Quan,* 221 Kan. 596, 600, 561 P.2d 825 (1977).

We have held a mortgage foreclosure or suit to determine priority of liens is equitable in nature and, hence, does not require a jury trial as a matter of right. *Fisher v. Rakestraw et al.,* 117 Kan. 441, 445, 232 Pac. 605 (1925). The Court of Appeals held a suit involving the rights of parties under a security agreement was essentially equitable and that no jury trial was required, stating: "The fact that there are some legal issues in what is otherwise essentially an equitable case does not entitle one to a jury trial." *Koerner v. Custom Components, Inc.,* 4 Kan. App. 2d 113, 124, 603 P.2d 628 (1979).

We have long held defendants, by filing legal counterclaims, cannot change the equitable nature of an action and then demand a jury trial as of right. *Fisher v. Rakestraw et al.,* 117 Kan. at 446. In *Bank of Whitewater v. Decker Investments, Inc.,* 238 Kan. 308, 710 P.2d 1258 (1985), the plaintiff brought an action for mortgage foreclosure. Two of the defendants filed counterclaims based upon fraud and misrepresentation. These defendants also requested trial by jury in their amended answers and at the pretrial conference. The trial court denied their request for a jury trial on the ground that a mortgage foreclosure proceeding is equitable in nature. We affirmed, stating:

"The general rule regarding the availability of a jury trial under these circumstances is that in the absence of a statute or rule of procedure dictating a contrary result, the asserting of a counterclaim of a legal nature by a defendant in an equitable action gives him no right to a jury trial." 238 Kan. at 314.

We find Vanier's cause of action based upon Ponsoldt's violation of their security agreement is essentially equitable in nature. There was no right to a jury trial as a matter of law. Ponsoldt's legal counterclaims do not give him a right to a jury trial in Kansas. Therefore, we hold the trial court did not err in denying Ponsoldt's request for a jury trial.

### III.

Ponsoldt next contends the trial court erred by finding LaCroix had committed auction fraud and then refused to reduce the contract price to the last good faith bid of $80,000. Lech was sold at an auction without reserve, which means the seller cannot withdraw the article to be sold unless no bid is made within a reasonable time. Ky. Rev. Stat. Ann. § 355.2-328(3) (Michie/Bobbs-Merrill 1987). Hence, Vanier did not have the right to withdraw Lech from the auction even if he was not satisfied with the bids.

Ponsoldt claims he has the right to rescind the contract or to complete the contract at a price equal to the last good faith bid pursuant to Ky. Rev. Stat. Ann. § 355.2-328(4), which provides:

"If the auctioneer knowingly receives a bid on the seller's behalf or the seller makes or procures such a bid, and notice has not been given that liberty for such bidding is reserved, the buyer may at his option avoid the sale or take the goods at the price of the last good faith bid prior to the completion of the sale."

The Kansas version of this section of the Uniform Commercial Code is identical. K.S.A. 84-2-328(4).

In addition to finding the auction was fraudulently conducted, the trial court held the claim of auction fraud was waived according to Kentucky law by Ponsoldt's subsequent acts. The court found Ponsoldt sensed the horse was being improperly bid at the auction but did not take steps to ascertain whether the auction was fraudulent. Ponsoldt's secretary testified he told her within two months of the August 1985 sale he believed the auction's bidding was fraudulent. The trial court found Ponsoldt had waived his right to object by making payments pursuant to the sales contract after he was aware of the possible fraud. Furthermore, Ponsoldt had actual knowledge of LaCroix's acts of auction fraud

in February 1987 at an auction in Arizona. Despite this knowledge, Ponsoldt made a payment on Lech the following month.

In Kentucky, a purchaser at an auction where fraud or puffing has occurred may repudiate his bid. Whether the price at which the property was ultimately sold is reasonable is not material or relevant. *Burdon v. Seitz,* 206 Ky. 336, 339, 267 S.W. 219 (1924). Although the defrauded purchaser has the right to rescind the contract or take the goods at the price of the last good faith bid, the purchaser loses his right to these remedies if, once he has knowledge of the real facts, he ratifies the contract. Ratification is established by the purchaser accepting the benefits of the contract or "by a failure to act promptly to repudiate the transaction." *Hampton v. Suter,* 330 S.W.2d 402, 406 (Ky. 1959).

In *Berg v. Hogan,* 322 N.W.2d 448 (N.D. 1982), the court applied U.C.C. § 2-328 and found the purchaser of equipment at an auction could not rescind the transaction because he had not acted promptly to do so. Only two months had passed from the date of the auction when the purchaser gave notice of his election to rescind by filing an answer in a lawsuit to collect payment. The North Dakota court based its decision upon the rule that the right to rescind requires the party to act promptly once the facts entitling him to rescission are discovered. The court further stated:

"We do not believe that the time or the fact when [the purchaser] became aware that the law permitted recission controls, but rather the date that [the purchaser] became aware of the facts or should have been aware of the facts that determine the reasonableness of when the rescission was asserted." 322 N.W.2d at 452.

We hold the trial court did not err when it found Ponsoldt had ratified the auction fraud and waived his right to rescind or to purchase Lech at the reduced price of $80,000.

### IV.

Ponsoldt contends fraud was also perpetrated by LaCroix, as an employee of Lasma and Vanier's agent, in regard to the condition and qualities of Lech. Ponsoldt argues LaCroix's representations that Lech was a top Arabian stallion and healthy or sound constituted fraud.

The trial court found the statements by LaCroix and contained in the Star Stallion Auction catalog were opinions, not representations of fact. Moreover, the trial court found there was no reason to believe the statements were not accurate at the time they were made. Thus, the trial court held neither Vanier as seller nor his agents and representatives, including LaCroix, had breached any warranties.

At the time of the auction the pre-sale veterinarian examination and health report prepared by Dr. Hemminger was made available to Ponsoldt and other prospective buyers. The installment purchase and security agreement states in part at paragraph six: "EXCLUSIVE WARRANTIES AND LIMITATIONS OF REMEDIES: The express warranties stated herein are exclusive of all other warranties and representations. ALL IMPLIED WARRANTIES, INCLUDING WARRANTIES OF MERCHANTABILITY, FITNESS FOR ANY PARTICULAR PURPOSE AND OTHERWISE, ARE EXCLUDED." The agreement goes on to expressly provide for warranties as to pedigree, registration, health and soundness, fertility, and title and delivery. This document was also available to Ponsoldt prior to the auction.

Ponsoldt does not claim a breach of the express warranties found in the installment purchase and security agreement and his claims of misrepresentation by LaCroix are not supported by the trial court's findings of fact. Hence, we find Ponsoldt was not fraudulently induced to purchase Lech by omissions and misrepresentations by the auctioneer.

### V.

The installment purchase and security agreement contained two clauses which Ponsoldt claims improperly limit his remedies. Paragraph 6 provides in part: "Buyer's remedies in contract or tort shall be limited to refund of all principal and interest payments made by Buyer upon prompt return of the Horse to Seller." Paragraph 7 states:

"NOTICE OF CLAIMS BY BUYER: Buyer shall make no claim for any breach of this contract, for rescission or revocation of acceptance, nor for any warranty, misrepresentation, mistake or tort, unless Buyer first notifies Seller in writing of the basis, nature and amount of the claim within thirty (30) days of the date of this contract, or within such other time as is

specifically provided for a particular warranty. Any suit by Buyer shall be brought within one (1) year after the cause of action accrues."

The Uniform Commercial Code provides that when an action is to be taken within a reasonable time, the agreement may fix the time if the time chosen by the parties "is not manifestly unreasonable." Ky. Rev. Stat. Ann. § 355.1-204 (Michie/Bobbs-Merrill 1987); K.S.A. 84-1-204. The Uniform Commercial Code further provides:

"(a) the agreement may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

"(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

"(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter.

"(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." Ky. Rev. Stat. Ann. § 344.2-719 (Michie/Bobbs-Merrill 1987); K.S.A. 84-2-719.

"Statute of limitations in contracts for sale.—(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. *By the original agreement the parties may reduce the period of limitation to ·not less than one year but may not extend it.*" (Emphasis added.) Ky. Rev. Stat. Ann. § 355.2-725 (Michie/Bobbs-Merrill 1987); K.S.A. 84-2-725.

Ponsoldt claims the trial court erred in not analyzing these statutory provisions with reference to his claims of fraud. Paragraph 7 of the installment purchase and security agreement provides the buyer must bring any suit within one year after "*the cause of action accrues.*" Such a period of limitation is expressly allowed under U.C.C. § 2-725(1). It is axiomatic that a cause of action for fraud does not accrue until the fraud is discovered or should have been discovered. We have already discussed the fact that Ponsoldt questioned the bidding process at the time of the auction. He was put on notice then and acquired more facts regarding LaCroix's inappropriate bidding practices in 1986 at other auctions. With this information, Ponsoldt had a duty to investigate and should have been able to discover the fraud.

Even assuming Ponsoldt did not discover the fraud until February 1987, Ponsoldt would still be barred from raising his fraud

claims. Although his counterclaim based on fraud was within the agreement's one-year limitation, Ponsoldt ratified the sale by his actions. As late as February 1988, a full year after he admits to seeing LaCroix fraudulently increase bids, Ponsoldt was offering to trade breedings by Lech to other horse owners. By exercising ownership control over Lech and not attempting to return Lech to Vanier, Ponsoldt waived his right to rescind the agreement based upon fraud. See *Hampton v. Suter*, 330 S.W.2d at 406; *Berg v. Hogan*, 322 N.W.2d at 451-52.

The same is true of any claim regarding LaCroix's statements amounting to fraud. Ponsoldt observed Lech at Bethesda in December 1985, at which time the swelling in his left hock was visible. At that time, Ponsoldt knew or should have known LaCroix's assertions regarding Lech's soundness were inaccurate. Ponsoldt, however, did not attempt to rescind the contract within one year of December 1985 in compliance with the terms of the sale agreement.

Ponsoldt argues the agreement so limits his remedy that it fails in its essential purpose, in violation of U.C.C. § 2-719(2). In light of our holding that Ponsoldt's claims of fraud must fail, any argument regarding the remedies available to him is moot. Furthermore, the agreement's limitations and terms are not unconscionable. The condition and value of an Arabian stallion could change drastically depending upon the buyer's treatment and, thus, a one-year limitation of actions provision is not unreasonable. We agree the 30-day limitation is unreasonable and violates U.C.C. § 2-725, yet in spite of this Ponsoldt is obligated to meet the one-year limitation. Ponsoldt argues the limitation provision in the contract was not conspicuous and was not expressly agreed to. The typeface of paragraph 7 is the same size as all other provisions within the contract. Thus, we find it is as conspicuous as any other term within the contract. As we discussed earlier, the agreement was available for Ponsoldt to read prior to the auction. Ponsoldt cannot now claim he did not agree to the terms of the contract because he neglected to read it.

We hold the one-year limitation of the installment purchase and security agreement is enforceable and Ponsoldt did not comply with that provision. Therefore, the trial court was proper in denying his fraud claims.

## VI.

Ponsoldt claims the trial court erred in asking Ponsoldt to make an election of remedies between rescission and damages for breach of contract. Ponsoldt responded by electing the remedy of rescission of contract. Ponsoldt claimed damages due to rescission of contract for the following: all purchase monies in connection with the contract; costs of care and maintenance of Lech; costs involved in breeding Lech; and attorney fees, and punitive damages. Ponsoldt later filed a statement of specific damages sought. This statement included damages for revocation of acceptance, auction fraud, and misrepresentation claims.

We have found the trial court was correct in denying Ponsoldt's claims for fraud, misrepresentation of the horse's condition, and breach of warranty. Hence, if the trial court committed error in requiring an election of remedies, which we are not deciding, it is harmless error.

## VII.

Finally, Ponsoldt contends the trial court erred in awarding Vanier attorney fees. Section 15 of the installment purchase and security agreement provides: "In the event lawsuit is brought with respect to this contract . . . , the prevailing party shall be entitled to reasonable attorneys' fees."

The trial court awarded Vanier $88,814.36 for attorney fees and expenses. To arrive at this figure, the trial court reviewed Vanier's exhibit 41, which lists total billings for professional services at over $100,000 and over $26,000 for expenses. Exhibit 41 lists the date of the service, the service rendered, and the charge. The billings which make up exhibit 41 do not include a breakdown of the time spent and the hourly rate charged. The trial court stated:

> "The reasonable value of an attorney's services cannot be determined by any fixed formula and the fixing of attorney's fees should be done with a view of common sense realism, that is, it should pose an amount that public standards will approve for work done, time consumed and skill required."

In setting the attorney fees the trial court considered the nature and importance of the litigation; the difficulty of the issues; and the degree of professional ability, skill, and experience called for and exercised in the performance of the services. The trial court

determined Vanier's attorney would earn between $100 and $125 an hour and assumed some of the billings were generated by associates whose charges would be substantially less. The trial court also considered the complicated nature of this litigation compounded by witnesses and evidence being scattered across the United States.

Ponsoldt argues the trial court erred because it did not specifically set forth the formula and justification for its award. For support Ponsoldt cites *In re Citizens Fidelity Bank & Trust Co.*, 550 S.W.2d 569 (Ky. App. 1977). That case, however, lists the same factors to be considered in awarding attorney fees as those listed by the trial court. The Kentucky Court of Appeals goes on to state: " '[It] should be done with a view to common sense realism, that is to say, it should pose an amount that public standards will approve for the work done, time consumed and the skill required.' " 550 S.W.2d at 570 (quoting *Brickell v. Di Pietro*, 152 Fla. 429, 12 So. 2d 782 [1943]). Ponsoldt claims the case also states the trial court "must still find a basis in the evidence submitted to support its determination." In *In re Citizens*, the appellate court was not provided a record upon which it could determine whether the trial court abused its discretion in awarding fees and, thus, remanded the case, ordering the trial court to make specific findings as to what services the attorney had provided.

In contrast, this case's file contains thousands of pages of testimony, pleadings, and other documents filed with the trial court. It is evident that the attorneys for all parties devoted great time and effort. A trial court may consider its own knowledge and experience when determining reasonable attorney fees. *Service v. Pyramid Life Ins. Co.*, 201 Kan. 196, 221-22, 440 P.2d 944 (1968).

We find the trial court did not abuse its discretion in awarding Vanier attorney fees.

The judgment of the district court is affirmed.

McFARLAND, J., not participating.